Jacob Markowitz, J.
This is a proceeding by the petitioner, City Bank Farmers Trust Company (formerly known as the Farmers’ Loan and Trust Company), trustee under a deed of trust made by Wood Fosdick, as donor, on May 4, 1918, for the construction of said deed of trust. By said deed of trust Fosdick created two trusts, in each of which 300 shares of General Electric Company stock were deposited to constitute the total original principal. These were transferred to the trustee by Fosdick; the deed of trust provided, among other things, that the income from one trust fund was to he paid to *1005 Anna F. Ernst (now dead) a niece of Fosdick, for her life and on her death to her daughter Katharine Davies Ernst (now Dohrmann) for life. The net income from the second trust was payable to Frances L’Hommedieu Jones (a niece of the donor Fosdick) for her life, and upon her death then to said Katharine Davies Ernst for life. Each trust was to terminate upon the death of the survivor and the principal in each fund was to be distributed to the donor Fosdick, or, if he be dead, to his executor or administrator to be treated as a part of his residuary estate.
Further contained in the trust indenture was the following provision: ‘ ‘ Anything hereinabove contained to the contrary notwithstanding, said Trustee shall transfer to said Donor, or if he is dead, to his executor * * * free of all trusts hereby created, any and all stock dividends which it may from time to time receive on any stocks held by it hereunder.”
The donor died on April 6, 1926, without revoking or amending the deed of trust. By will and codicil, which were probated in the Surrogate’s Court of New York County, be named thereunder the American Museum of Natural History as his sole residuary legatee. The donor’s estate has been completely administered except for such interest which it may have in “ stock dividends ” under the above-quoted provision in the deed of trust.
The question here presented for construction arises from the fact that, after the donor’s death, the trustee received in each trust stock distributions from the General Electric Company and from the Standard Oil Company (Indiana).
By virtue of stock distributions prior to 1954 (less sales by the trustee) the trustee on April 20, 1954 held in each trust 1,200 shares of General Electric common stock without par value. On April 20, 1954 at the annual meeting of the stockholders of that company, the following ‘ resolution ’ was duly adopted: “ Resolved: (a) that the 35,000,000 shares of Common Stock without par value which the Company is presently authorized to issue be changed into 105,000,000 shares of Common Stock with a par value of $5 each, on the basis that each such previously authorized share of Common Stock without par value, whether issued or unissued, shall be changed and converted into three shares of Common Stock having a par value of $5 each.”
The notice of annual meeting and proxy statement sent to the shareowners of General Electric, stated: “ The Company at the present time has issued 28,845,927.36 shares of its Common Stock without par value. These shares have a stated value for capital purposes of $6.25 each, resulting in a total *1006 capital of $180,287,046. If the action proposed above is taken by the shareowners, the Company will have issued 86,537,782.08 shares of stock having a par value of $5 each. This will require the Company to increase its capital from $180,287,046 to $432,-688,910.40. Your Board of Directors has accordingly taken the necessary action to provide that such increase will become effective upon the adoption by the share owners of the foregoing resolution, by the transfer of $252,401,864.40 from the Company’s reinvested earnings (earned surplus) which as shown in the Annual Report for 1953 amounted to $729,862,586 at December 31, 1953.”
The effect of the action taken by the General Electric Company was (1) cancellation of all its old stock; (2) increase of the capital of the company to $432,688,910.40; (3) increase of the issued and outstanding stock to 86,537,782.08 shares, each having a par value of $5; (4) replacement of the former issued and outstanding 28,845,927.36 shares of common stock, without par value but of a stated value for capital purposes of $6.25 a share, by the issuance of 36,057,409.2 shares of $5 par value stock for the then existing capital of $180,287,046; (5) issuance in addition of 50,480,372.88 shares of $5 par value stock and capitalizing surplus by transferring surplus to capital in the amount of $252,401,864.40, which represented new capital. Thus five twelfths is the proportion of the new stock which represents the former capital, while the remaining seven twelfths of the new stock represents new capital. Each trust thereafter received 3,600 shares of the new stock.
On September 29, 1950, the trustee purchased 100 shares of stock of Standard Oil Company (Indiana) for each trust. On September 23, 1954, the board of directors of Standard Oil Company (Indiana), by resolution duly adopted, provided for a cash dividend and “ Further Resolved that a stock dividend of 100% on the capital stock of this company issued and outstanding, including treasury stock, be and hereby is declared payable first out of capital surplus and the remainder out of earned surplus, on the 1st day of December, 1954 to stockholders of record at the close of business on the 25th day of October, 1954; ” * * *.
As stated in the petition: “ In order to provide for the additional shares to be distributed as a stock dividend to holders of its capital stock of record on October 25, 1954, the Standard Oil Company (Indiana) transferred the sum of $405,746,402.38 to its capital account being $25 for each additional share issued. Of this sum $174,612,824.62 was transferred from capital surplus, being the entire balance in the capital surplus account *1007 of the company on that date. The balance of $231,133,577.76 was transferred from earned surplus.”
The effect of the action taken by Standard Oil Company (Indiana) was the issuance of a stock dividend of new stock and the transferring of $405,746,402.38 to its capital account, being $25 for each additional share issued. The funds transferred from the company’s capital surplus account constituted 43.03% of the entire sum transferred to the capital account, and the funds transferred from the company’s earned surplus account constituted 56.97% of the funds transferred to the company’s capital account. On December 1, 1954, each trust received 100 additional shares of stock.
The residuary legatee, the Museum, claims that seven twelfths of the new General Electric stock and the entire dividend of Standard Oil Company (Indiana) are stock dividends and as such should be turned over immediately to it. It is the contention of the income beneficiaries (Dohrmann and Jones) that it was not the donor’s intention by his trusts that any portion of the General Electric or the Standard Oil Company (Indiana) stock now held by the trustee be distributed to the Museum; that it was his intention to make the income beneficiaries the primary objects of his bounty; that the 1954 General Electric capital changes did not involve a “ stock dividend ”; that only a portion (if any at all) of the Standard Oil Company (Indiana) dividend may be construed to constitute a true ‘ ‘ stock dividend ’ ’ and that the deed of trust be construed as requiring all shares of General Electric Company stock and Standard Oil Company (Indiana) stock, now held by the trustee, should be retained by it as part of the principal of the two separate trusts, and in any event, no more than 56.97 shares of the Standard Oil Company (Indiana) stock should be distributed to the Museum.
The income beneficiaries also contend that they are entitled to receive the income from the additional and/or changed stock until the death of the survivor of each trust and that then and only then should there be a distribution of the additional or changed stock together with the other parts of the corpus or trust to the Museum. The income beneficiaries do not contend that the aforesaid dividends be construed as ordinary income and thus be turned over to them as such. They, however, do contend, in addition to the foregoing, that in the event the court deems the stock, capitalized from earned surplus, as a stock dividend under this trust, under no circumstances may that part of Standard Oil Company (Indiana) stock, capitalized from surplus capital (to wit, 43.03%), be deemed a stock divi *1008 dend under the trust, but should in effect be considered a stock split, and as to that part of the stock it should be added to the corpus of the trust and they should receive the income therefrom accordingly.
The issues tendered, therefore, present this query — whether or not the stock in question, which was declared and delivered as hereinbefore stated, is to be classed and construed as true “ stock dividends ” within the meaning of those words as used by the donor Fosdick in his deed of trust. By such construction it is sought to determine whether by reason of the provisions contained in the deed of trust relating to “ stock dividends ”, seven twelfths of the 3,600 shares of General Electric Company stock and/or one half of the 200 shares of the Standard Oil Company (Indiana) stock held in each of the two trusts, should be distributable at this time to the American Museum of Natural History (referred to as “ Museum ”). The consequence of this determination would be, in the event of a holding that it is a true ‘ ‘ stock dividend ’ ’, to cause this stock to be forthwith delivered to the Museum; whereas in the event of a holding to the contrary, the stock would thereby become part of the principal of the trust and the income thereof then would be payable, to the income beneficiaries until the termination of the life of the survivor beneficiary when the principal beneficiary, the Museum, would then receive the stock. ,
Construction and interpretation of the words “ stock dividends ’ ’ have been before our courts on many occasions. A “stock dividend” generally is any dividend payable in stock of the corporation declaring or authorizing such dividend. Such dividends usually capitalize surplus (Equitable Trust Co. v. Prentice, 250 N. Y. 1, 12; Matter of Matthews, 105 N. Y. S. 2d 211, 216, mod. and affd. 280 App. Div. 23, affd. 305 N. Y. 605; City Bank Farmers Trust Co. v. Ernst, 263 N. Y. 342, 346). ‘ ‘ Dividend ’ ’ and 1 ‘ stock dividend ’ ’ are defined in subdivision 8 of section 350 of the New York Tax Law as follows: “ 8. The word 1 dividend ’ means any -distribution made by a corporation out of its earnings or profits to its shareholders or members, whether in cash or in other property or in stock of the corporation, other than stock dividends as herein defined. ‘ Stock dividends ’ means new stock issued, for surplus or profits capitalized, to shareholders in proportion to their previous holdings.” White on New York Corporations (12th ed., vol. 4, pp. 34-35) states: “ G. Stock dividends. A dividend which is payable in the stock of the corporation declaring or authorizing the dividend is a ‘ stock dividend.’ Such a dividend merely evidences the transfer of an accumulated surplus to the capital *1009 account of the corporation and takes nothing from the property of the corporation and adds nothing to that of the shareholder. A stock dividend does not distribute property but simply dilutes the shares as they existed before.”
In Eisner v. Macomber (252 U. S. 189) the Supreme Court stated at pages 209 and 211 the following in its thorough and comprehensive analysis of a stock dividend:
“ For bookkeeping purposes, the company acknowledges a liability in form to the stockholders equivalent to the aggregate par value of their stock, evidenced by a ‘ capital stock account. ’ If profits have been made and not divided they create additional bookkeeping liabilities under the head of ‘ profit and loss,’ ‘undivided profits,’ ‘surplus account,’ or the like. None of these, however, gives to the stockholders as a body, much less to any one of them, either a claim against the going concern for any particular sum of money, or a right to any particular portion of the assets or any share in them unless or until the directors conclude that dividends shall be made and a part of the company’s assets segregated from the common fund for the purpose. * * *
‘ ‘ In the present case, the corporation had surplus and undivided profits invested in plant, property, and business, and required for the purposes of the corporation, amounting to about $45,000,000, in addition to outstanding capital stock of $50,000,000. In this the case is not extraordinary. * * *
“ A ‘ stock dividend ’ shows that the company’s accumulated profits have been capitalized, instead of distributed to the stockholders or retained as surplus available for distribution in money or in kind should opportunity offer.”
An excellent analysis of stock dividends and explanation of the reasons for such is contained in the well-reasoned opinion in Williams v. Western Union Tel. Co. (93 N. Y. 162). The pertinent portion merits quotation here at length and reads as follows (pp. 191-192): “After subtracting the dividend there remained to the company the full amount of its prior capital stock, to-wit: Property to the value of $41,073,410. Such is the finding of the trial court, and that cannot here be disputed. The company had made surplus earnings which it could have divided, but instead of dividing them it had invested them in property to facilitate and enlarge its business; and such property was found to be worth $15,526,590. That sum constituted its surplus. It was commingled with the other property of the company and used for corporate purposes. But it was not beyond the reach of the dividend-making power of the directors. They could reclaim it for division among the stock *1010 holders, and, if practicable, convert it into cash for that purposé. They could borrow money on the faith of it and divide that. They could issue to the stockholders certificates of indebtedness, redeemable in the future, representing their respective interests in such surplus, thus, in effect, borrowing the same of the stockholders. Desiring to use the surplus and add it to the permanent capital of the company, and having lawfully created shares of stock, they could issue to the stockholders such shares to represent their respective interests in such surplus. In doing these things no law would be violated, the capital would be kept intact, and no stockholders or creditors would have any legal right to complain. All this, however, depends upon the finding of the trial court that the surplus is equal to the dividend. That finding is not open to criticism here. It was not disturbed at the General Term and therefore concludes us.”
In Matter of Davis (128 N. Y. S. 2d 152) the court, in holding that new shares issued were a stock dividend, said (pp. 153-154):
' ‘ This court has heretofore pointed out the difference between a stock dividend and a stock split. * * * In the former, there is a capitalization of earnings or profits and a distribution of the shares which represent assets transferred to capital, while in the latter there is a mere increase in the number of shares without altering the amount of capital or surplus. The distinguishing feature ' is the permanent retention of earnings in the business through formal transfer of earned surplus, legally available for dividends to capital account.’ (Patón, Accountant’s Handbook [3d ed.] p. 1016; * * *.)
1 ‘ Even though the board of directors spoke of the transaction as a stock split, the corporate records show clearly that their purpose was to capitalize earnings and to issue additional shares of stock which, in part, represented the earnings thus permanently retained.” See, also, Equitable Trust Co. v. Prentice, 250 N. Y. 1, supra; Matter of Norton, 129 Misc. 875; Soles v. Granger, 174 F. 2d 407, 410; Matter of Lissberger, 188 Misc. 811; Matter of Lissberger, 189 Misc. 277, affd. without opinion 273 App. Div. 881; Matter of Strong, 198 Misc. 7, 19, affd. without opinion 277 App. Div. 1157; Matter of Lawrie, 119 N. Y. S. 2d 906, 911.)
Were it not for the provision in the trust, referred to in the next paragraph, the trust would terminate upon the death of the survivor of the life beneficiaries and at that time the trustee would be free of all trusts. The principal would then be turned over to the Museum. Again, were it not for the same referred-to provision of the trust, “ stock dividends ”, when not deemed *1011 payable to the income beneficiaries, would become and form part of the trust corpus and upon termination of the trust would then devolve to the designated beneficiary. At that time it would be free of all trusts.
However, that is not the situation presented here. We are called upon to consider the provision of the deed of trust which reads as follows: ‘ ‘ Anything hereinabove contained to the contrary notwithstanding, said trustee shall transfer to said Donor, or if he is dead, to his executor or administrator, free of all trusts hereby created, any and all stock dividends which it may from time to time receive on any stocks held by it hereunder.” (Italics mine.) To me the language of this provision is clear and unambiguous. By its direction the donor directed his trustee to transfer any and all stock dividends either to himself, if living, or, if dead, to his executor. I am of the ultimate opinion that the use of the phrase ‘ ‘ free of all trusts hereby created ” by the donor was by design and inserted for the specific intent stated. It was not mere surplusage. It is thereby clear that the transfer was to be made to the donor at any time regardless of the termination of the life income benefits. Such a transfer prior to the termination of the trust obviously would permit the donor or the principal beneficiary (the Museum) to receive such stock dividend free from the trusts. By the very language of the deed of trust the donor specifically referred to “ stock dividends ” which may be received on any stocks. These were not, I am convinced, an idle recitation of ordinary words, but on the contrary were used and expressed by design and for the intent stated. Fosdick intended and stated in unambiguous language that the trustee shall transfer “ any and all stock dividends which it may from time to time receive on any stocks ” either to himself, if living, or, if dead, to his executor. To permit the addition of the stock dividend to the trust corpus to be retained by the trustees until the termination of the trusts would do violence to the donor’s direction and intent. This is further evidenced and buttressed by the following facts: when the donor created the trusts on May 4, 1918, he gave to the trustee of each trust only shares of General Electric Company stock so that the entire principal of the trusts was initially invested in this stock. General Electric had years before established a “ stock dividend” policy and made payments accordingly. Shortly before the creation of the trusts herein, General Electric announced a policy of paying annual “ stock dividends ” as well as cash dividends. In each stock dividend paid the additional capital required for the stock dividend was realized by a transfer from *1012 the undivided earnings (surplus) account of the company to its capital account. All the dividends paid in the stock of the General Electric Company distributed during the life of the donor were paid to him by the trustee. These stock dividends were the same kind of stock dividends in principle as are involved here. Moreover, the fact that the donor did not amend his deed of trust in respect of the disposition of the “ stock dividends ” nor make other disposition thereof in his will is strong evidence of his intention as I construe it. I can therefore reach no other conclusion, in the light of the foregoing facts and the trust provision involved, than this, that the trustee should follow the same procedure after the donor’s death. Perforce, the payments would be made under the terms of the donor’s will to the Museum. The intention of the donor, being clearly expressed, is controlling and must be carried out (Matter of Osborne, 209 N. Y. 450, 458).
The income beneficiaries’ contention, that the percentage of the stock issued'that was capitalized by the transfer of capital surplus to the capital stock account of Standard Oil Company (Indiana) is not a stock dividend, is without merit and I find the authorities cited in support thereof not in point and therefore inapplicable. The Standard Oil Company repeatedly refers to its transaction as a stock dividend. The fact that the capital necessary for the additional stock issued came in part from capital surplus account and in part from the earned surplus account does not alter the situation (Matter of Lawrie, supra; Matter of Chapman, 208 Misc. 390; and other authorities hereinbefore cited).
From the foregoing and the wealth of authoritative decisions cited, it is readily seen that it has uniformly been held that a declaration of dividend, such as was here made by the General Electric and Standard Oil Companies, must and can only be construed and determined to be a stock dividend, as contended by the Museum.
Accordingly, I am of the ultimate conclusion and find that the 4,200 shares of General Electric $5 par value common stock (representing seven twelfths of the 3,600 shares of said stock now held in each trust) and 200 shares of the Standard Oil Company (Indiana) $25 par value capital stock held by the trustee (representing one half of the 200 shares of said stock held in each trust) constitute “ stock dividends ” and are distributable free from any trust forthwith to the American Museum of Natural History as residuary legatee under the will of the donor, Wood Fosdick, deceased. Settle order.